Good morning, counsel. May it please the court, Greg Erickson from Mormon-Cartel & Erickson on behalf of the appellant Petra Brokken. Also with me in the courtroom is Vincent Feinlander and Benjamin Lonari. You're going to have to speak up. Also with me in the courtroom It's a bike. You can move the platform, but you can't mumble, right, because we might as well not be doing this. I understand. Your Honor, appellant is asking this court to reverse the Rule 12 dismissal of appellant Petra Brokken's Title VII and MHRA claims because the district court applied the wrong standards to both its adverse employment action and constructive discharge analysis, which were the fundamental underpinnings of the district court's Rule 12 dismissal of Ms. Brokken's claims. The applicable standard of review on this Rule 12 dismissal is de novo. The appellant Petra Brokken was given two choices by her employer, Hennepin County, either resign with benefits intact or be fired for following her religious beliefs. Ms. Brokken worked as an attorney at the Hennepin County Defender's Office for 26 years, and in that time, she had accumulated 1,285 PTO hours of benefits from vacation and sick leave, which is approximately the equivalent of about $90,000 worth of benefits. The county acknowledged and hence admitted that Ms. Brokken had sincere religious beliefs by giving her exemptions from both the county's COVID vaccine mandate and from testing. Any question regarding the sincerity of Ms. Brokken's sincerely held religious beliefs is not to be determined at the motion-to-dismiss stage, but is a fact question for a jury. What is the adverse employment action here? I think I know the answer, but I wanted to hear the argument. The adverse employment action is, if you don't test, we are going to fire you. So, and when she gave them sincerely held religious beliefs that conflicted with the testing requirement, when she notified them of that fact, the adverse employment action is the revocation of the original acceptance of her religious exemption to testing, okay, and then threatening to fire her. I wonder if you are making the burden too high for yourself, which is, she didn't get fired. She resigned. So, I wonder whether the adverse employment action is actually more simple, which is what you suggested before, which is, she lost these benefits. She lost the hours. She lost her retirement benefits. The threat was she would lose her retirement benefits. That seems pretty adverse under Muldrow. Am I wrong about that? That's 100 percent correct, Your Honor. In this particular situation, the proper analysis, the analysis that the district court did not approve or did not use is whether or not a reasonable person would quit under the circumstances. And when you are going to be terminated, because in order to follow her religious beliefs, she wasn't going to agree to test, so she was going to be terminated, when you advise the employer, hey, if I'm terminated, am I going to lose this $90,000 in PTO? And they say, yes, and that's what's pled in our complaint. Any reasonable person is not going to wait to be terminated and not take the bird in the hand versus the potential two in the bush in the litigation. And that was placed as a condition on her continued employment, which is why I think we're, I think Judge Thunheim made this a lot more difficult than it had to be, because when you say there's $95,000 of benefits out here, and if you don't resign, you don't get them, that's a new condition placed on your receipt of the $95,000. One hundred percent. Those PTO hours were completely vested. They were basically her property. And what the county was threatening to do is to take away her vested benefits because in order to compel her to resign, which she, of course, did, because any logical person would resign under those circumstances. Does the district court, I know the district court makes fact findings about it, but do they make, I'm looking at the opinion, do they make a clearer finding about adverse action in the opinion? Your Honor, on page, well, the underpinning of the district court's opinion is that we were unable to allege an adverse employment action, which, of course, we think that. Does the district court say that? One hundred percent. Can you tell me what page? It's on page 5. Okay. Yes, it is. Thank you. Proceed. Yes. And one of the things that's super important here, Your Honor, is when you look at the standards that the district court is using, it's not only using the wrong standard for adverse employment action because it requires an intent element, Your Honor. Okay? The intent element is supposedly referenced in a district court case in Norgren. Unfortunately for the district court, the Eighth Circuit, in the reversal of the district court in Norgren, put the proper standard, which was established by the United States Supreme Court in Green v. Brennan in 2016. And the proper standard established in Green v. Brennan in 2016 is that you need to have conduct that would force a reasonable person to resign. Okay? And you need to resign. And the point of my question, I now understand it, because the district court said even if there were an adverse action, they go ahead and talk about all the other issues, right? Exactly. Okay. So you ought to address all the other issues. The absolute underpinning for the district court decision relied on an imperfect standard. And that in and of itself, I would submit, requires reversal. Okay? With respect to the other standard, the district court said even if there were an adverse action, they go ahead and talk about all the other issues. Okay? And the point of my question, I now understand it, because the district court said even if there were an adverse action, they go ahead and talk about all the other issues. Okay? With respect to the other standard, the district court utilized the standard in determining an adverse employment action, a tangible change in the working condition that produces a material employment disadvantage, including circumstances amounting to a constructive discharge. Okay. In the district court's defense, Muldrow had not come down. I don't think Muldrow changed that as much as you do. That's your prerogative, Your Honor. They didn't wipe out the word material. Your Honor, 100 percent in the text of Muldrow, the Justice Kagan says you don't need to say the issue is substantial. Substantial is not equal material. And that is just elementary. Your Honor, what the court did in Muldrow was it took the analysis back to the original text of Title VII. Okay? In the original text of Title VII, is the word material included? Absolutely not. It is not. Your Honor, the word disadvantageous, kind of a tongue twister, is in there. And whether we're talking about materiality or disadvantageous, there needs to be some change to the works, I think. Without question. Without question, there has to be something. But material, like I grew up as a contract lawyer. Okay? There's a difference between a default and a material default. Okay? To me, the Muldrow, what it says, and I think Cole follows this same analysis, if you can prove, if you can allege a default, okay, maybe not a material default, a default, that satisfies the adverse employment action requirement in Muldrow. And frankly, it's consistent with Title VII. On Cole, one of the things that I, and you heard me ask in the last case, it almost takes away the inference of discrimination. I mean, it says basically it's satisfied if you're denied a religious exemption, which I think is the argument you're making. And maybe it's right. But usually the way that's proven is you say, we didn't get religious exemptions, but other people got exemptions for, like, health conditions and things like that when they couldn't take the vaccine because of a health condition. We don't have that here. And so I think you have to put a lot of weight on Cole. Or do we have that here? Do we have any allegations that other people were treated differently? Well, Your Honor, I want to point out to the Court, because honestly, I just figured this out last night, is that a failure-to-accommodate claim is a subset of a disparate treatment claim. And that's referenced in our brief in EEOC v. Abercrombie. And, frankly, not to reference an earlier argument, the concept that undue burden can be dealt with at the motion-to-dismiss stage is completely wrong. And there's case law all over the country that says that. Undue burden is a fact issue that at most is amenable at summary judgment. Okay? Back to my original question, though. Is there any allegations that any other class of people were treated differently? In other words, they were given exemptions, but religious exemptions were denied by Hennepin. Maybe you don't need that, but I'm just wondering what's in the light. We haven't. This is the problem with dealing with this at the Rule 12 stage. We haven't been able to do discovery. We don't know if the medical exemption people were treated differently than us, which was the case in a number of our other cases. Okay? We haven't had that opportunity because they denied us the ability to conduct discovery to find that out. And we're not going to allege things that we don't know are true. And, Your Honors, I would like to reserve three minutes for a vote. Ms. Lynch?  May it please the Court, Counsel. My name is Katie Lynch, and I represent the defendant Applee, Hennepin County, in this case. In 2021, Hennepin County implemented a workplace safety policy that was temporary for all staff working in person during the height of the pandemic. Hennepin County bent over backwards for plaintiff in this case when it granted her religious exemption to vaccination. There's no dispute. She was never required to vaccinate, and that was never questioned. Hennepin County granted her request to have different duties that could be performed fully remote for as long as remote work was available for trial lawyers in the Hennepin County courts. When courts went back in person and remote work was no longer possible, all plaintiff had to do, candidly speaking, was to spit into a tube once a week at her home while being paid by the county. But the difference between this case and the last case is there is a voluminous explanation in the complaint as to why. Now, you could say that maybe some of these things are far-fetched, and I think there's something about her energy or something. But those are, we have to take that at face value. Those are sincere religious beliefs. And so we have a lot in the complaint talking about why the testing itself violated her religious beliefs. Your Honor, I would respectfully disagree on the testing piece. I think there's a lot in the complaint. Paragraph 44, Counsel? Oh, my goodness. Oh, my goodness. It's more than in the Ringhofer case, right? I would disagree because in Ringhofer, as you know, Your Honor, the plaintiffs who objected to testing in that case were able to plausibly connect, I think the language from the opinion was specific religious principles to the testing. Now, Ringhofer is distinguishable here for a couple of reasons. First of all, I scoured the opinion in Ringhofer and even in the filings. I don't know what type of testing was at issue in that case, but we know what type of testing is at issue here, and that is clear and not in dispute. I'm just going to read you some of what's in there. I mean, it involved the testing involves transporting her material or mixing biological materials with serum taken from fetal bovines. The process of obtaining fetal bovine serum is formed through placing an agent. It goes on and on, in essence, torturing the calves, which violates my sincerely held beliefs. I don't know how she could have pleaded anymore. I mean, it seems to me, like, again, you can say, I think those are far-fetched, and maybe they are, but we, I mean, the Supreme Court's been clear. We have to take that at face value. Yes. So we're at Rule 12. So we assume this allegation is true, that she holds these beliefs. But what I would argue here, Your Honor, and this is our alternative argument. I'll get to our primary argument, but I want to answer your question, is that this does not plausibly explain how doing a self-administered saliva test at home requires transporting or mixing materials. She's not giving her materials to anyone. And in her complaint, she alleges that she was willing to do a temperature check. So a temperature check also includes using or giving biological materials to take a test. That sounds like a summary judgment argument to me. And it does add the, or mixing her biological materials. At self-home, you've got to surely mix something with something. Well, I don't think that's in the complaint. No, that is in the complaint, Counsel. What you were doing is transporting her material, or mixing her biological materials, and then she goes on with the serum. Yes. So we don't think that that plausibly creates a conflict with the type of testing at issue here. But that's our alternative. Is that in the complaint? Can we tell specifically the kind of testing that doesn't use her religious belief? I think that's what is missing from the complaint, is she doesn't draw that connection that tells us the type of testing here required mixing my materials. Well, she says that. She says that. Yeah. It's a, I would argue, a conclusory statement. But the Court doesn't need to get to this issue because we've got a threshold issue on the adverse employment action, and the district court correctly dismissed for a few reasons here on that. Counsel, what about this sentence in paragraph 39 on information and belief? There have been attorneys and other staff in the past who have been accommodated, and she lists all kinds of accommodations in paragraph 39, including remote working. You know what it says. Why doesn't that do enough for differential treatment, period? I know it's in information and belief. We could have a separate debate about that, but why doesn't that do it? Your Honor, she's not, she's not drawing a plausible inference based on religion. That's the problem here. Well, you've got to put that one with the other one. I'm sorry? You have to put paragraph 39 with paragraph 44 and the rest of the complaint, don't you, counsel? Yeah. We really, we read the complaint as a whole, for sure. So we don't parse it, you know, that's in the Ringhofer case. And what we're arguing here is there's not plausible facts alleged here connecting the county's implementation and enforcement of its policy based on religion. She doesn't allege that other people who did not hold religious beliefs, I mean, she just says other people were accommodated for various reasons. That does not establish a plausible inference. Usually various means something different, a little bit. I don't, I don't know. You know, when you say various, there are various reasons I can't go to the party. Yeah. Yeah. Okay. Proceed. You know, you wanted to get to the adverse employment action, and I really have a simple question, which is, I think that Judge Chunham was just flat wrong because he didn't look at it correctly, which is the $95,000. Post-Muldrow, I mean, even if Muldrow didn't change anything, I actually still think it satisfies it. But a disadvantageous change. Prior to the mandate, she was entitled to the $95,000, or however much it is, could be $5, but $95,000. After the mandate, she risked losing it. As far as I'm concerned, that's game over. That's a disadvantageous change in the conditions of employment. How can that possibly be wrong after Muldrow? Sure, Your Honor. Just a few points here. First of all, the $95,000 is not in the complaint. I don't think that's fair. But, counsel, counsel, you know what paragraph 35 says. It always says $95,000. You know what paragraph 35 says? It says 1,285 hours of banked leave. Right. I mean, we don't know. At least they're a buck apiece. That's why I said it could be $5, too.  But 1,285 hours. At least they're a buck apiece. Go ahead. I just wanted to clarify that that's not in the complaint, the amount of money. But second of all, that was not the only ultimatum that Hennepin County gave to her. She had this at-home saliva testing option. Board testing. She had to do one of the two. And that gets us back to the, but I'm just saying, I just don't know how you get past the Adverse Employment Act. If she, let's just assume, I know you disagree, sincerely held conflicts with her religious beliefs. It just seems to me that the 1,280 hours, I think I had that right, or the $95,000 is an adverse employment. It's a change in the conditions of employment to the worse for her. I respectfully disagree. And here's why. That would only happen if she was fired for not testing. Well, and I understand that she alleged that she was told she would be fired if she didn't do one of those two things. Am I wrong in that? Right. That's the allegation is that she was told that if she did not test, she would be subject to termination. She was basically Now we get into constructive discharge. Correct. And the district court applied the wrong standard, didn't apply the federal standard. You cite, or somebody cites Henry from the Supreme Court of Minnesota. That's not the federal standard. Let me clarify. I don't think Muldrow impacted the constructive discharge test. No, it wasn't an issue there. Right. It wasn't an issue in the other case of the plaintiff, plaintiff Kohler.  So Norgren and Kohler, none of those were constructive discharge cases. Norgren was a constructive discharge case. But the plaintiff didn't really win. There were two plaintiffs in that case, and the one that alleged a constructive discharge on a Rule 12b-6, this Court upheld the dismissal. And that's exactly what this Court should do here. Because The plaintiff gets almost no help. I'm sorry? She doesn't get any help from Norgren. Correct. Correct. On this issue. Yes. And it's on that threshold issue of when an employee resigns, which this is why Muldrow does not impact constructive discharge. When an employee resigns, they quit. The employer is not actually terminating them. And so what the U.S. does is that there has to be this higher standard. In order to keep it on par with an actual discharge and hold the employer liable, it's this higher bar of objectively intolerable conditions. This standard is higher than our hostile work environment, severe or pervasive standard. Okay. So I wonder about that. Now, this is where I think Muldrow did change things. Maybe not a lot, but a little bit, which is I think the change in the condition is probably good enough. Saying you had something before, which was 1,280 hours. You don't have it now if we end up firing you. But let's assume for the sake of argument that that's not correct. I do think that saying to somebody you will lose $95,000 or 1,280 hours, that would cause me to, if I was making $50,000, I have no idea what she's making. But to lose a two-year salary or a year's salary or whatever in money, that would make me want to quit at her age than, you know, given the circumstances. Your Honor, I don't think it meets that high bar. This Court's precedent says the threat of loss of pay is not sufficient to meet that high bar of objectively intolerable conditions. Nearly $100,000? Well, I don't think that's in the record. We have 1,280 hours. And even if that did lose, result in a loss in pay, let me just put it in context. In Norgren, the Court sort of laid out, here are some examples of the extreme conduct that can meet this standard. It's things like physical threats, humiliation in the workplace, making discriminatory, repeated discriminatory comments and slurs, conduct that reaches the level of unreasonably interfering with an employee's ability to work. We don't have those allegations here. Is $2 million enough? $3 million? You lose your entire retirement? Where do we draw the line at? You either quit and lose your $100,000 a year job, or you lose $2 million in retirement benefit? I think you have to — I think Norgren tells us we put it in the context of the circumstances. And the circumstances here is we have some amount of money at issue, but what's the other option? The other option is at-home saliva testing. Once a week. Once a week, while you're being paid. No cuts in pay. The test itself is free. Any objectively reasonable employee would have done that testing instead of losing that job. If it didn't violate the religious beliefs. Yeah. I mean, here's a problem I'm having. If somebody told me I had to work on Friday nights because it's Shabbat, you may say, well, that's ridiculous. But if I say that's my — and it is my sincerely held religious beliefs, I don't do that, and you're going to lose your, you know, $2 million, $95,000, again, I'd probably quit. So how can I then say that a reasonable person wouldn't quit under those circumstances? Well, let's go back to what Judge Benton was saying, which is it violates your sincerely held religious beliefs. At least at this stage, we have to assume it. Well, I think the plaintiff in Norgren made that argument as well, and I think that's at risk of turning the constructive discharge test into a subjective test. We look at the — what were the conditions? What was the employer telling the employee to do? And there could be other examples that are more extreme, because that's what — we do need extreme conduct here. It's a constructive discharge. And the conditions here, it's our argument that the connection that plaintiff has alleged or attempted to allege between her religious beliefs and saliva testing at home, in the privacy of her home, is tenuous. We don't think it passes the plausibility level, but even if this Court were to say it's plausible, well, now we got to jump up here to objectively intolerable. I don't think that the allegations here jump to that level. The other piece that I want to address, I do want to distinguish — I think I talked a little bit about Ringhofer and why this case is distinguishable from that case. I also want to talk about Cole, because I think Your Honor had asked a question about Cole. The difference between Cole in this case is that it was not just an alleged denial of religious accommodation in Cole. What Cole had, and the Court focused on, is the fact that as a result of the employee's accommodation being denied, she had to continue working in a way that singled her out based on her religious beliefs and vaccination status. Her job duties were involuntarily reassigned. There was this badge lock system that basically gave favorable treatment to people who chose to vaccinate. And essentially the employee felt uncomfortable coming to work because she was ridiculed and humiliated by her coworkers. That was enough to meet plausible inference of discrimination and a plausible adverse employment action under Muldrow. We don't have that here. Hennepin County bent over backwards to make this a reasonable and convenient process for people to comply. And so the testing was done at home, not in the workplace. There's no special masking requirements alleged. There's no special badge locks in this case. So there's not enough here to plausibly draw that inference that discrimination was occurring because of the plaintiff's religion. On the face of the policy itself, and I think plaintiff acknowledges in her complaint, that the policy was neutral. It was applicable to all employees who came to work, who had to work in person. And there's no allegation that the county applied the policy to her because of her religious beliefs. We think that's detrimental. I'm just about out of time. So unless there's other questions, I do appreciate your time. And we respectfully request that this Court affirm the dismissal of all claims. Thank you.  Your Honors, what we have is a fundamental disagreement as to the standards that I think the standards suggested by Annapin County just fundamentally cannot be the standards that this Court applies after Muldrow came down. I do want to point out that Norgren said that an adverse employment action would include the denial of a promotion. Okay? The denial of a promotion. When you compare that with the potential loss of $90,000, I mean . . . Her hourly rate is $77 an hour. I mean, she's a lawyer. Let's just say the minimum wage in Annapin County is $15. So you're talking a very significant amount of money, particularly in this economy. The important thing that I think that Annapin County did in their argument, and it's replete throughout their brief, is that all Ms. Brocken needed to do in order to keep her job was violate her sincerely held religious beliefs. They say that again and again and again. The concept of a policy that appears to be neutral does not change the fact that it may affect people of faith in different ways. I would direct your attention to Abercrombie because it's the exact same thing. A theoretically, you know, normal policy regarding dress in Abercrombie can have a negative effect on a person of faith because their faith prohibits a certain kind of  loss. And in my mind, this, what they're proposing here is analogous to Abercrombie because it's, no one's disputing that they applied the policy to everyone, okay? But when you have people of faith, some people can object to an otherwise, a policy that appears to be neutral. Is the Abercrombie case in your brief? Yes. It's in our reply. Tell me the real name of it. Pardon? I didn't see it in the A's. No, proceed. Your Honor, my time is up. We respectfully request that the district court's Rule 12 dismissal be reversed, and I thank you for your time this morning.